Filed 11/24/20  P. v. Warren CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>THOMAS P. WARREN,<br><br>　　Defendant and Appellant. | B304544<br>(Los Angeles County<br>　Super. Ct. No. PA029565) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David W. Stuart, Judge.  Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

By amended information, defendant and appellant Thomas P. Warren was charged with committing first degree murder (Pen. Code, § 187, subd. (a); count 1) and conspiracy to commit murder (*id.*, § 182, subd. (a)(1); count 2).[1] The information also alleged that the murder was committed while lying in wait (§ 190.2, subd. (a)(17); count 1), and that defendant, though not personally armed, knew that a principal was personally armed with a firearm (former § 12022, subds. (b), (d); counts 1 & 2). In 1999, a jury convicted defendant of both charges and found the lying in wait and firearm allegations to be true. Defendant was sentenced to life imprisonment without the possibility of parole on count 1, plus two years for the firearm enhancement. Defendant was also sentenced to 25 years to life on count 2, plus two years for the firearm enhancement, both of which were stayed (§ 654).

In 2019, defendant filed a petition for resentencing under section 1170.95, which provides that persons who were convicted under theories of felony murder or murder under the natural and probable consequences doctrine, and who could no longer be convicted of murder following the enactment of Senate Bill No. 1437 (S.B. 1437), may petition the sentencing court to vacate the conviction and resentence on any remaining counts. (Stats. 2018, ch. 1015, § 1, subd. (f).) Following the appointment of defense counsel, briefing, and a hearing, the trial court denied defendant's petition. The court found that defendant was

---

[1] Undesignated statutory references are to the Penal Code. Defendant was tried alongside codefendant Dennis Forsythe Reese, who is not a party to this appeal.

not entitled for relief as a matter of law, because the jury was never instructed on felony murder or on the natural and probable consequences doctrine, and the jury found defendant guilty of conspiracy to commit murder, which required a finding that defendant intended to kill the victim. In light of our prior opinion clarifying that defendant was not the actual killer, the court found the jury's verdicts on counts 1 and 2 amounted to "direct aiding and abetting with an intent to kill."

Defendant appeals from the trial court's order, and contends that the allegations in his petition established a prima facie showing of entitlement to relief. The Attorney General contends, and we agree, that the record of conviction, including our prior opinion in *People v. Warren* (Jan. 25, 2001, B136940) [nonpub. opn.] (*Warren I*), establishes that defendant is not entitled to relief as a matter of law. We affirm the judgment.

## FACTUAL BACKGROUND[2]

Defendant, Reese, Paul Ware, and Robert Frost were members of a group interested in performing stunt work. On occasion, John Fitusi trained with the group. Sometime between March and May 1998, Reese threatened "to take care of [Fitusi], or take him out."

In late April 1998, Reese and Fitusi agreed to participate in an insurance scam to enable Fitusi to obtain money for the theft of his car. On May 1, 1998, Fitusi parked his car at Union Station in Los Angeles

---

[2] We recite the facts from our prior opinion in *Warren I*.

3

and took the train to Modesto, where he stayed for three days.  After picking up Fitusi's car the same day, Reese used the car for stunt work and later abandoned it.  On May 3, Reese picked up Fitusi from the train station so that Fitusi could rent a white Buick Skylark.

On May 8, 1998, between 11:00 p.m. and midnight, Reese and Joseph Trentcosta picked up defendant, and the three men returned to Trentcosta's apartment.  In the apartment, Trentcosta overheard defendant say, "I don't want to touch the body"; "[w]hen you do this you have to pop up the hood to protect the flash bang"; and "just walk up to him and pop or empty bust rounds, bust a cap."  Trentcosta asked what was going on, and Reese replied that it did not concern him.  Reese continued, "I'm going to make it look like a white car murder."  Defendant interjected, "What do you got to worry about it for?  He never liked you anyway."  Reese stated, "I got him to get a rent-a-car, and I'll make it look like a white car murder."  Reese never gave a name, but stated that "[h]e can ruin my life."

Reese then pulled a gun out from a paper bag and loaded it with bullets.  After Reese argued with Trentcosta about what was going on, Reese said, "No matter what you say or do . . . nothing's going to change.  It's got to happen. . . .  This has got to be tonight," and "[w]e've got to meet him.  Got to meet him at 2:00."  Sometime after midnight, Reese and defendant left with the gun and bullets.

Around 3:00 a.m. on the next day, Fitusi's body was discovered on the shoulder of a highway, slumped forward in the driver seat of a white Buick Skylark.  He had been shot six times.

4

Sometime after 3:00 a.m., defendant and Reese arrived at Trentcosta's apartment and woke him up. Reese immediately entered the bathroom, closed the door, and began running the water. Afterwards, Reese sat next to Trentcosta and said, "I was here . . . . I was here. I was here," before he left Trentcosta's apartment. Defendant stayed the night. Around 8:00 a.m., in response to Trentcosta's inquiry of what happened, defendant said, "Well, he's done. He's done. Dead. It's over. It's over."

Trentcosta reported the incident to the police.

Following the murder, Reese told Frost, who had loaned him the gun and bullets, that the gun was at his mother's house. After describing Fitusi's death, Reese asked Frost to tell anyone who inquired that Reese was at Frost's residence around the time of the murder. Frost telephoned Trentcosta at defendant's behest and relayed Reese's message that he did not need him for an alibi.

Reese testified at trial that it was Trentcosta—not Reese or defendant—who killed Fitusi. According to Reese, Trentcosta was following Fitusi and had told Reese that Reese and Trentcosta had been implicated, and that the two would have to "alibi each other." Defendant presented evidence attacking Trentcosta's credibility. Three character witnesses testified that they believed defendant to be of good moral character who would not have committed the charged crimes.

## PETITION FOR RESENTENCING

On February 27, 2019, defendant filed a section 1170.95 petition for resentencing. In his petition, defendant checked the boxes

5

indicating that an information was filed against him that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; he was convicted at trial of first or second degree murder pursuant to the felony murder rule or the natural and probable consequences doctrine; and he could not now be convicted of first or second degree murder because of the changes made to Penal Code sections 188 and 189. Defendant requested that counsel be appointed on his behalf.

Following the appointment of defense counsel, the People filed an opposition to defendant's petition. The People argued that defendant was not entitled to relief as a matter of law, because the jury was never instructed on felony murder or the natural and probable consequences doctrine as a theory of liability for murder. For the jury to convict defendant in count 2 for conspiracy to commit murder, it was required to find beyond a reasonable doubt that defendant intended to kill Fitusi. Those who harbor an intent to kill, and who aid, abet, counsel, induce, solicit, request, or assist in the killing are still liable for murder following the enactment of section 1170.95. To support their argument that defendant directly aided and abetted the murder, the People quoted the following language from our prior opinion: "The overwhelming evidence reflects [defendant] was not just a bystander or that he simply went along for the ride. Rather, his role was that of a knowing, willing, and active enabler. By instructing [Reese] step-by-step on how to commit the shooting, [defendant] facilitated the shooting, even if he himself did not pull the trigger. His presence at the scene no doubt strengthened [defendant's] resolve to go through with their

6

murder plan, and afterwards, [defendant] continued to carry out Reese's directives. . . . Also, although he was not the actual shooter, [defendant] advised the shooter, Reese, how to carry out the shooting . . . . [Defendant] and Reese left together for the fatal rendezvous with Fitusi and returned together afterwards."

Following defendant's reply brief, the court held a hearing on his petition. The People reasserted its argument that defendant was not entitled to relief as a matter of law. Defense counsel "disagree[d] with that evaluation," and concluded (without any evidentiary support) that defendant was not the killer, was not present, and did not furnish a gun. The court noted that there was "no other way to be convicted of conspiracy to commit murder" without an intent to kill. Thus, the court concluded based on defendant's convictions on counts 1 and 2 were "just like direct aiding and abetting with an intent to kill," which precluded defendant from being entitled to relief.

Defendant timely appealed.

## DISCUSSION

1.  *Governing Law*

The legislature enacted S.B. 1437 "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); accord, § 189, subd. (e).)

7

S.B. 1437 also "added a crucial limitation to section 188's definition of malice for purposes of the crime of murder." (*People v. Verdugo* (2020) 44 Cal.App.5th 320, 326 (*Verdugo*), rev. granted, S260493, Mar. 18, 2020.) Under the revised section 188, subdivision (a)(3), "'[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' [Citations.]" (*People v. Lewis* (2020) 43 Cal.App.5th 1128, 1135 (*Lewis*), rev. granted, S260598, Mar. 18, 2020.)

Section 1170.95, as enacted by S.B. 1437, permits individuals who were convicted of felony-murder or murder under the natural and probable consequences doctrine, but who could not be convicted of murder following S.B. 1437's changes to sections 188 and 189, to petition the sentencing court to vacate the conviction and resentence on any remaining counts. (§ 1170.95, subd. (a).) A petition for relief under section 1170.95 must include a declaration by the petitioner that he is eligible for relief under section 1170.95 based on all the requirements of subdivision (a), the superior court case number and year of the petitioner's conviction, and a request for appointment of counsel, should the petitioner seek appointment. (§ 1170.95, subd. (b)(2).)

If the petition includes the required information, subdivision (c) of section 1170.95, prescribes "a two-step process" for the court to determine if it should issue an order to show cause. (*Verdugo, supra,* 44 Cal.App.5th at p. 327.) The court first "review[s] the petition and determine[s] if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section." (§ 1170.95, subd. (c).) The court then appoints counsel, if requested, and reviews the petition a second time after briefing by the parties to determine if

petitioner has established a prima facie case for relief. (*Ibid.*; see *Lewis*, *supra*, 43 Cal.App.5th at p. 1140.) If the court concludes that the petitioner has made a prima facie showing, it must issue an order to show cause. (§ 1170.95, subd. (c); *Verdugo*, *supra*, at p. 328.)

"Once the order to show cause issues, the court must hold a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts." (*Verdugo*, *supra*, 44 Cal.App.5th at p. 327, citing § 1170.95, subd. (d)(1).) The parties may rely on the record of conviction or present "new or additional evidence" to support their positions. (§ 1170.95, subd. (d)(3).)

2.    *Analysis*

Without arguing that he was in fact convicted of felony murder or murder under the natural and probable consequences doctrine as an aider and abettor (and without providing an evidentiary basis outside of his petition to support such findings), defendant contends that the trial court was required to credit as true the allegations in his petition that he was convicted under either theory of liability for murder. We disagree.

"'It would be a gross misuse of judicial resources to require the issuance of an order to show cause or even appointment of counsel based solely on the allegations of the petition, which frequently are erroneous, when even a cursory review of the court file would show as a matter of law that the petitioner is not eligible for relief. For example, if the petition contains sufficient summary allegations that would

9

entitle the petitioner to relief, but a review of the court file shows the petitioner was convicted of murder without instruction or argument based on the felony murder rule or [the natural and probable consequences doctrine], . . . it would be entirely appropriate to summarily deny the petition based on petitioner's failure to establish even a prima facie basis of eligibility for resentencing.' [Citation.]" (*Lewis, supra*, 43 Cal.App.5th at p. 1138, quoting Couzens et al., Sentencing Cal. Crimes (The Rutter Group 2019) ¶ 23:51(H)(1), pp. 23–150 to 23–151; accord, *Verdugo, supra*, 44 Cal.App.5th at p. 333 [superior court properly considered as part of the record of conviction the prior appellate opinion "which affirmed [the] convictions for conspiracy to commit murder and first degree murder, in determining whether he had made a prima facie showing of eligibility for relief under section 1170.95"].)

Defendant asserts the proceedings set forth under section 1170.95, subdivision (c) are analogous to the "screening mechanisms" following the filing of a petition for writ of habeas corpus, and following the filing of a petition for resentencing under Proposition 47. Though we agree with defendant's analogies, they lend him no support. On the contrary, in both proceedings, trial courts may review a petitioner's record of conviction to determine whether the allegations set forth in the petition are untrue as a matter of law. (*People v. Drayton* (2020) 47 Cal.App.5th 965, 979 [habeas corpus]; *People v. Washington* (2018) 23 Cal.App.5th 948, 955 [Proposition 47]; *People v. Page* (2017) 3 Cal.5th 1175, 1189 [same].)

In this case, the trial court properly reviewed defendant's record of conviction to determine whether the allegations set forth in his petition were untrue as a matter of law. Our limited review of the appellate record (defendant has not furnished the jury instructions or verdicts) confirms that the allegations in defendant's petition were untrue as a matter of law. The information charged defendant with the following two felony counts: first degree murder (count 1) and conspiracy to commit murder (count 2). The information did not charge or list another crime for which defendant could be held liable for felony murder, or for murder under the natural and probable consequences doctrine. In other words, no predicate felony was identified that could give rise to either theory of liability for first degree murder. (See Stats. 2018, ch. 1015, § 1, subd. (f) [S.B. 1437 was enacted to amend "the felony murder rule and the natural and probable consequences doctrine, as it relates to murder"].) The conviction on count 2 confirms that the jury found beyond a reasonable doubt that defendant (and his co-conspirator, Reese) personally intended to kill Fitusi. (*People v. Juarez* (2016) 62 Cal.4th 1164, 1170; *People v. Swain* (1996) 12 Cal.4th 593, 607.) In light of that finding, the conviction on count 1 for first degree murder, and our prior opinion (wherein we stated that defendant acted as a "knowing, willing, and active enabler" who assisted in the murder), defendant would still be convicted of murder following the changes in S.B. 1437. (See § 189, subd. (e)(2); see also Stats. 2018, ch. 1015, § 1, subd. (g) ["[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea"].)

Defendant has provided no circumstance in which a defendant convicted of murder and conspiracy to commit murder, and without a predicate felony on which to base felony murder or a theory of natural and probable consequences, could still be entitled to relief under section 1170.95.  Therefore, defendant's petition failed to make "a prima facie showing that [he] falls within the provisions of [section 1170.95]" as a matter of law.  (§ 1170.95, subd. (c).)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.

We concur:


COLLINS, J.


CURREY, J.